**Application of Erwin PLOCKINGER and Wolfgang Holzgruber.**

**Patent Appeal No. 8953.**

United States Court of Customs and Patent Appeals.

Aug. 16, 1973.

Arthur O. Klein, New York City, attorney of record, for appellants. Alfred W. Vibber, New York City, of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Fred E. McKelvey, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN, and LANE, Judges, and ALMOND, Senior Judge.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 2–11 of appellants' application.[1] No claims have been allowed.

### The Invention

The invention is a process for producing steels having high machinability characteristics. Claims 10 and 11 are representative:

10. A process for producing a steel having good machining properties, which comprises immersing a consumable electrode of a starting material having substantially the composition of the desired steel into a molten slag, electrically fusing said electrode in said slag, and zone casting the resulting molten metal in a metal mold, said starting material containing at least one alloying element which improves the machinability of the steel and which is soluble in the molten metal, said slag consisting essentially of:

a) 10%–40% $Al_2O_3$;

b) 10%–50% $SiO_2$;

c) up to 40% $TiO_2$;

d) up to 40% of oxides of alkaline earth metals;

e) up to 70% of $CaF_2$ provided that the slag is substantially free of boric acid;

f) up to 20% of boric acid provided the slag is substantially free of $CaF_2$;

g) the balance up to 10% consisting of inevitable purities [sic: impurities?]; the $SiO_2$ content of the slag amounting to at least 1.1 times the oxides of alkaline earth metals content.

11. A process for producing a steel having good machining properties, which comprises immersing a consumable electrode of a starting material having substantially the composition of the desired steel into a molten slag, electrically fusing said electrode in said slag, and zone casting the resulting molten metal in a metal mold, said starting material containing at least one alloying element which improves the machinability of the steel and which is soluble in the molten metal, said slag being selected from the following group of slag compositions:

1. 10%–40% $SiO_2$, 20–50% $Al_2O_3$, balance $CaF_2$ and impurities;

2. 20–30% CaO, 30–40% $SiO_2$, balance $Al_2O_3$ and impurities;

3. 20% CaO, 30% $SiO_2$ 20% $Al_2O_3$, balance $CaF_2$ and impurities;

4. 14% $SiO_2$, 21% CaO, 14% $Al_2O_3$, 21% $CaF_2$, 30% $TiO_2$.

The physical steps recited in the claims correspond to a process known as "electroslag refining," or "electric slag zone refining." Appellants point out that it was "already known in the art to use an electroslag remelting process for production of certain types of steels." Appellant states that while this process would appear to be attractive for the production of steels having good machining characteristics,

a problem arises, which has not been solved before and which resides in that certain alloying elements which improve the machining properties by the formation of occlusions, such as sulfur, phosphorus, selenium or tellurium, can readily be introduced into the starting material, but are removed from the molten steel during the reaction with the molten slag. * * *

[1]. Serial No. 597,229, filed November 28, 1966.

Thus, the present invention is concerned with the problem of providing slags which when reacting with the molten starting material do not remove the desired alloying elements from said material and which are nevertheless suitable for the process in question. * * *

* * * * * *

The slags to be used according to the invention consist suitably of 10–40% $Al_2O_3$, less than 10% impurities, balance oxides of alkaline earth metals, preferably CaO, in an amount of up to 40%, and/or CaF in an amount of up to 70%, preferably 10–70%. In the presence of oxides of alkaline earth metals, the silicon[2] content should be at least 1.1 times the amount of such oxides.

Claims 2–9 all depend from claim 10, and contain limitations which it is unnecessary to detail here.

### The References

Peras[3] is directed to the electroslag refining of ferrous metals and alloys. The process is disclosed to be useful for purification of reduced ores such as sponge iron, the material primarily exemplified, as well as steel and other alloys. Peras uses a slag which may include:

such oxygenated constituents as silica, alumina and calcium oxide used for the purpose of adjusting the basicity (such that the minimum index of basicity shall be 1) and the temperature of melting, such halogenic fluxes as fluor-spar and possibly sodium fluoride, barium chloride or cryolite, such oxygenated fluxes as sodium silicate and fluidifying agents such as titanium oxide, manganese oxide, and the like. The object sought is to regulate the fusibility, the fluidity, the electro-

lytic conductivity and the solubility of the iron oxide, and the basicity of the slag. The composition of the slag is determined according to the electrolysis reactions which will dictate the limits of oxygen, sulphur and phosphorus contents of the fused steel, and the suitable silicon, manganese and aluminum contents to be chosen according to the properties that are sought.

Several more specific examples of suitable slang compositions are given, none of which meet the limitations of the present claims. In describing the apparatus used in his process, Peras further states:

In this device the electrolytic reactions originated in the slag ensure the reducing character of the surface reactions of the metal bath and a correct composition of the steel; with this treatment, the steel may be freed of any noxious elements such as nitrogen oxygen, phosphorus, sulphur and non-metallic inclusions by properly adjusting the slag compositions.

Hopkins[4] is directed to an improved flux composition for use in the system described as follows:

After molten metal, especially of the ferrous alloy type, has been deposited in a mold, it is desirable to hot-top the deposited metal to control its solidification and/or to maintain the top portion thereof fluid until the last, and in condition to feed the shrinkage cavity below. For that purpose, electric current is discharged through a gap, or gaps, between the end, or ends, of one or more non-consumable electrodes and the surface of the molten metal in the mold while the end of the electrode, or electrodes, the surface of the molten metal and the gap, or gaps, are maintained beneath the surface of a body of flux. The electric current

2. Sic: silica. See note 7 *infra* and accompanying text.

3. U.S. Patent No. 3,234,608, issued February 15, 1966, on an application filed September 3, 1964, which was a continu-

ation-in-part of applications No. 68,751 and No. 68,772, filed November 14, 1960.

4. U.S. Patent No. 2,694,023, issued November 9, 1954.

discharged across the gap, or gaps, effects the necessary heating of the metal.

The composition of Hopkins' flux is as follows:

|  | Percent |
|---|---|
| $Al_2O_3$ | 30–65 |
| $CaF_2$ | 10–20 |
| $SiO_2$ | 5–25 |
| CaO | 0–15 |
| MgO | 0–20 |

The fluxes disclosed are said to have desirable properties including high conductivity and low viscosity.

### The Rejections

Claims 2–10 were rejected under 35 U.S.C. § 103 as unpatentable over Peras. The examiner considered that since Peras taught control of the amount of sulfur in the end product by control of the slag composition, it would have been obvious to control the slag components to get the optimum desired end product. Appellant responded with the contention that those skilled in the art would have considered the Peras process unsuitable for manufacturing highly machinable steels, since that process was known to remove non-metallic inclusions, such as sulfur, which impart the desired machinability to the steel. In support of their argument, appellants pointed to Peras itself, which notes that "the steel may be freed of any noxious elements such as * * * sulphur," an article by one Williams,[5] and a partial translation of an article by one Richling.[6] While the examiner did not specifically mention the Williams or Richling article in his answer, he maintained his position that it was "a clear teaching of *Peras* * * * to vary and control the slag composition and, in turn, to control or limit the composition of the steel casting." Appellants also pointed to the re-

quirement in Peras that the index of basicity be greater than one and contended that the limitation in claim 10 that the silicon to alkaline earth oxide ratio be above 1.1 fixed appellants' maximum index of basicity at 0.9, below Peras' requirement. The examiner responded:

> The contention of Applicants that the casting produced by *Peras* would materially differ from the casting produced by their process because the silica to alkaline earth oxide ratio of *Peras'* slag would be less than at least 1.1, *as claimed,* is obviated by the teaching of *Peras* that the sulfur content of *Peras'* casting is limited or controlled, by varying the slag composition; therefore, a sulfur containing, and necessarily machinable, steel casting can be produced by the process of *Peras.*

Claim 11 was rejected under 35 U.S.C. § 103 as unpatentable over Peras in view of Hopkins. The examiner considered that it would have been obvious "to control the slag composition within the percentage ranges of Hopkins which overlap" the first of the composition formulas recited in claim 11. The reasoning behind the rejection is substantially the same as that behind the rejection of the other claims.

The board essentially adopted the position of the examiner.

### Opinion

*I. Appellants' Motion*

■ A few days before oral hearing, appellants filed a motion, objecting to what appellants considered to be new issues raised in the Solicitor's brief, and asking the court to either decide the case without considering those issues, or to remand the case to the board for consideration of them. At the time of oral argument, May 7, 1973, we indicated our intent to grant the motion, and oral ar-

---

5. A. C. Williams, *Uses of the electroslag remelting process,* J. Iron and Steel Inst., pp. 581–87 (July, 1964). Only page 581 of the article appears in the record before us.

6. This is referred to only as "an article by W. Richling in the journal entitled: 'Neue Huette', volume 9, published in September 1961."

gument was limited by excluding discussion of the questioned issues. However, at the close of oral argument it was pointed out that the Solicitor had not been given adequate time to respond to the motion, and we granted additional time for that purpose. Within that time the Solicitor submitted a "Motion to Vacate Order of May 7, 1973," and appellants have responded to that motion.

As appellants point out, throughout at least a major portion of the prosecution of the application appellants have relied on the criticality of the limitation in claim 10 that the $SiO_2$ content of the slag must be at least 1.1 times the amount of the oxides of the alkaline earth metals, stating that this requirement must be met if the sulfur is to be retained in the alloy. That contention was questioned in the Solicitor's brief on two bases. The first basis was stated thus:

> Appellants have not disclosed that the claimed ratio of $SiO_2$ to alkaline earth metal oxides is critical, because the specification discusses * * * only the ratio of silicon [the element, Si, not silica, $SiO_2$] to alkaline earth metal oxides [emphasis added, footnote omitted].

This refers to the portion of appellants' specification quoted at footnote 2, *supra*. In the papers submitted in support of appellants' motion it is pointed out that the spelling of silicon in the specification was merely a typographical error.[7] The Solicitor accepts that explanation, and thus the first "new issue" is no longer before us.

The second basis on which the Solicitor questioned appellants' allegations of criticality was that appellants' own specification states that "slags with which good results have been achieved" included the fourth composition recited in claim 11, in which composition the $SiO_2$ to alkaline earth metal oxide ratio is *less than* 1.1. In a declaration in support of

their motion, appellants agree that this discrepancy exists, allege that it only exists because the specification was in error, and suggest that the claim and the specification be amended in a certain way. Appellants also complain that this discrepancy was not considered by the examiner or the board, and stated that "the Solicitor in now arguing against the criticality of this ratio has raised a new ground of rejection and therefore has raised a new issue."

The final "new issue" apparently alleged by the appellants is the fact that the Solicitor in his brief mathematically demonstrated that compositions meeting the limitations of the claims, including the limitation of the $SiO_2$ to alkaline earth oxide ratio of a minimum of 1.1, could still have an index of basicity greater than one, using Peras' formula. This is directly contrary to appellants' contention before the board that their minimum ratio of 1.1 ensured a maximum index of basicity of about 0.9.

While the questions presented are difficult ones, we do not consider that the Solicitor's observations (1) that appellants' contentions of criticality of the 1.1 ratio were contradicted by the utility of a composition below that ratio, or (2) that appellants' contentions concerning the index of basicity of their claimed compositions were in error, amounted to new rejections or new issues on the facts of this case. The *issue* concerning the index of basicity was brought before the examiner and the board by *appellants*, in order to show that Peras' teachings run contrary to appellants invention. Appellants complain that the fact that the board said nothing on this issue led them to "the assumption that the Board of Appeals had considered the record before it and had agreed with applicants' interpretation of the teachings of Peras and applicants' specification." While discussion by the examiner and board certainly would have been desira-

7. This explanation is supported by the fact that claim 1, as originally submitted, contained essentially similar language to that of the specification, but using "$SiO_2$" instead of "silicon."

ble, we do not think that the board's silence justifies appellants' assumption. In view of the fact that the board *affirmed* the examiner's rejection, it may well be that the board felt appellants' contention to be so blatantly erroneous as to require no comment.

Under the circumstances of this case, the Solicitor should be allowed to point out to us the facts underlying Peras' concept of the index of basicity, *all* of which were before the board, in order to rebut appellants' contentions with regard thereto.

Likewise, *appellants* introduced the issue of criticality in order to rebut any prima facie case of obviousness established by the Patent Office. In order to determine the propriety of the rejection, this court must be able to examine the evidence to determine whether, and to what degree, the criticality contended for by appellants exists. Without introducing a new theory of rejection, the Solicitor should have the power to focus this court's attention on the evidence which is pertinent to issues of criticality, unexpected results, etc., where both that evidence and that issue were before the lower tribunals. If the Solicitor had formulated what was tantamount to a new theory of rejection in this case, we would refrain from considering it in reaching our decision. However, that has not happened here. Rather, the Solicitor has merely functioned as any other attorney would by pointing to the evidence of record which is favorable to his client's position, and explaining its relevance.

For the foregoing reasons, the motion to vacate our order of May 7, 1973, is granted, and appellants' motion to remand or to disregard the Solicitor's contentions with regard to the criticality and the index of basicity issues is denied.

## II. The Rejections

■ On this record, we agree with the conclusions of the examiner and the board. Peras does suggest that those skilled in the art would have known how to control the amount of sulfur or other inclusions removed from the metal treated in the electroslag process by varying the slag composition. The fact that sulfur was undesirable in the metals Peras refined does not detract from that suggestion. The Williams and Richling articles also appear to deal with metals in which sulfur is undesirable, and add little to Peras in that regard. As noted, appellants claim criticality in the minimum silica/alkaline earth oxide ratio of 1.1, which appellants contend minimizes the extraction of the desirable included materials and thus allows materials to be refined which have substantially the same composition as the desired steel product. That allegation of criticality is effectively refuted in this record by the fact that, of the two specific slag compositions for which good results are reported in the specification, one (corresponding to composition 3 in claim 11) satisfies that requirement and one (composition 4 of claim 11) does not meet that requirement. While appellants have explained that their specification is erroneous and should be amended, the proper forum for such a move is the Patent Office, not here. Finally, the Solicitor was clearly correct in stating that many compositions meeting the 1.1 ratio would have an index of basicity greater than one, the Solicitor giving one example of such a composition where magnesium oxide is the alkaline earth oxide. Appellants appear to have neglected to divide the concentrations of the various components by their molecular weight in calculating their indices of basicity, whereas the index of basicity equation used by Peras requires that step.

With regard to claim 11 appellants state:

> Claim 11 * * * clearly recites that the starting material, namely the consumable electrode, includes at least one alloying element which improves the machinability of the steel and which is soluble in the molten metal. * * * Peras does not mention such alloying elements being present in the consumable electrode.

On the contrary, Peras does disclose the refusing of metals which contain sulfur, albeit Peras desires to get rid of the sulfur, as noted above. Appellants argue that Hopkins requires the presence of MgO in the flux, which is allegedly excluded from claim 11. It is hard to see that magnesium oxide is *required* when the range given for that material is from *zero* to twenty percent. Appellants' other contentions are equally unpersuasive of error in the rejections.

The decision of the board is affirmed.

Affirmed.